Ranney and Gere vs. Higby.

ORVILLE W. RANNEY and WM. F. GERE, Plaintiffs in Error,

*vs.*

LEWIS J. HIGBY, Defendant in Error.

ERROR TO THE MILWAUKEE CIRCUIT COURT.

When a contract is made between the parties at a distance from each other, by means of letters from each to the other, it is the province of the court to examine the correspondence and construe the contract; and it is error to submit to the jury the question, what the contract so entered into was.

The letters being proved, and the acts of the parties, it is the duty of the court to determine their legal effect, and whether or not they constituted a contract, and to give construction to the same.

When a merchant at one place orders goods of another at a distant place, to be shipped in a certain manner, and the vendor ships the goods according to order, the delivery on board ship is a constructive delivery to the vendee, and they are thenceforth at the risk of the latter.

THIS was an action of assumpsit for 350 bbls. of salt, sold by the plaintiffs to the defendant in November, 1851, and shipped at Buffalo, N. Y., on the schooner Juniatta Patton, to him at Milwaukee. Declaration, common counts, with bill of particulars. Plea, general issue.

Upon the trial in the court below, at the May term, 1856, the plaintiffs read in evidence the following letter from them to the defendant:

"*Buffalo, November* 13, 1851.

"L. J. Higby, Esq.—Dear Sir: We have shipped you per brig Helfenstein, 300 bbls. fine salt, at 30c. freight, and have insured the same at 9s. per bbl. If you wish to pay cash for it, we will take 8s. 6d. per bbl., or 110c. at 60 days. This is all we could get the H. to take. The Hale will be here soon, we suppose, and should you want more, telegraph us.

"Yours, &c., 　　O. W. RANNEY & Co."

Also, a letter from the defendant to the plaintiffs, of which the following is a copy:

"*Milwaukee, Nov.* 17, 1851.

"O. W. Ranney & Co.:—I received your letter to-day, and advice of 300 bbls. salt on brig Helfenstein, at 30c. freight, and bill same at 110—60 days. I should not paid the difference you make six days since, but just made an investment, which cuts me short of ready means. I also telegraphed to send me here 1,500 bbls. salt, and if you cannot send the 500 bbls. to Sheboygan at say 10c. more per bbl. than here, you need not send it; but if you can, send it.

"Do the best you can in ft. contract, and advise me. Get it insured for your benefit if lost. The 500 to Sheboygan is in addition to the 1,500 here, and if you cannot send to advantage that amount, send what you can. Let me hear from you on receipt.

"Yours, &c.,             L. J. HIGBY."

And also a letter received by the defendant from the plaintiffs, the material part of which is as follows:

*Buffalo, Nov.* 19, 1851.

"L. J. Higby, Esq.—Dear Sir: Your telegraph for 1,500 bbls. salt was received yesterday, and to-day we have shipped per schooner Sam Hale 1000 bbls., and per schooner Juniatta Patton 350. This is all they would take. The Patton took at 30c. freight. These vessels will get through, if any can.

"We shall probably draw on you at 60 days for bill of purchase and insurance. It is all in nice order, though it has snowed all the time it was going on board, and will come out wet, still that will not hurt it.

"Yours, &c.,             O. W. RANNEY & Co."

The plaintiffs then offered in evidence a telegraphic dispatch, with a printed heading in the usual form, and containing the following. The words in italics were in the original, in writing, and the remainder in print:

"Buffalo, *Nov.* 18, 1851——o'clock, *P. M.*

"By Telegraph from *Milwaukee.*

"To *O. W. Ranney & Co.:—Send me here fifteen hundred barrels salt as per letter on sixty days.* *L. J. Higby.*"

Which was objected to by the defendant as not sufficiently identified or proven, and was ruled out by the court, to which ruling the plaintiffs' counsel then and there excepted.

The deposition of Watson Spencer was then read by the plaintiffs, to the effect that in November, 1851, he was captain of the schooner Juniatta Patton. That on or about the 19th of that month, 350 barrels of salt were shipped on that vessel, by the plaintiffs at Buffalo, consigned to the defendant at Milwaukee. That he signed the bill of lading of the salt on the same day, he thought, that the salt came on board. He made only one trip from Buffalo that month.

On cross-examination he stated (under objection from the plaintiffs' counsel) that the salt was lost in a storm on the way to Milwaukee, and was not received by the defendant.

The plaintiffs then gave in evidence the bill of lading of the salt, which was in the usual form, signed by the master and showing the shipment by the plaintiffs from Buffalo, Nov. 19, 1851, to the defendant at Milwaukee, on the Patton, of 350 brrrels fine salt, at 30 cents freight.

The plaintiffs then rested their case, and the defendant's counsel offered in evidence the following letters:

"*Buffalo, Aug.* 26, 1851.

"L. J. Higby, Esq.—Dear Sir: We ship you to-day per Propeller Genesee Chief, 805 bbls. fine salt, at 20c. freight. We charge you the same at 110c. here. We have to allow Captain Strong the privilege of selling a little at the Islands, should he have a chance to make anything, but probably he will not sell any. If he does he is to pay you 9s. per bbl. and collect no freight on it. We will try and ship you more and hope to at less freight. Yours, &c., O. W. RANNEY & Co."

Also the following:

"*Buffalo, Nov.* 21, 1851.

"L. J. Higby, Esq.—Dear Sir: We have drawn on you to-day for $1,500 at sixty days.

"The writer will be absent from home a few days, and on his return will make up your account. Should the salt now on the way to you be lost, we will look to the insurance company for the amount, and the paper may be returned. We were obliged to realize on the salt, but could not get 60 days paper discounted, so we use the draft as collateral, which saves getting an indorser. Please accept the draft and oblige

"Yours, &c., O. W. RANNEY & Co."

Also a draft which was in the defendant's possession, as follows:

"$1,500. "*Buffalo, Nov.* 21, 1851.

"Sixty days date please pay to the order of Jas. M. Ganton, Esq., Cashr., fifteen hundred dollars, and charge the same to account of "Your obedient servants,

"O. W. RANNEY & Co."

"To L. J. Higby, Esq., Milwaukee, Wisconsin."

On the face of which was written in the same handwriting, "Paid by O. W. Ranney, Buffalo, January 31, 1852." It was indorsed "accepted, L. J. Higby," and was protested for non-payment, January 23, 1852.

It was admitted by the defendant, that this draft when paid by Higby, was placed to his credit on general account, by the plaintiffs.

The defendant's counsel also offered in evidence the following letters:

"*Buffalo, Jan.* 31, 1852.

"L. J. Higby, Esq.—Dear Sir: Yours of the 21st inst. inclosing warehouse receipt 600 bbls. flour to order of Messrs. Crouse and Bennet, and your draft on them of $1,500 at 90 days,

is received. We have also received protest on the draft, we drew on you of $1,500, due 23d inst. We inclose your account, showing balance against you $401.98. The 350 bbls. per schooner Juniatta Patton is insured in the Utica Insurance Company at 9s. per bbl. and will be paid 60 days after proof of loss if the company do not fail in the meantime. It is in good repute now and we have no reason to doubt its soundness. Still the matter ought to be attended to at once. We have been in daily expectation of receiving the evidence of loss from you and Mr. McKay. The company hopes the vessel went ashore in some sandy place, and that she and the cargo will be saved. Please send the captain's protest and all the facts you can gather, to us, as soon as possible.

"Yours, &c.,        O. W. RANNEY & Co."

Also the following letter :

"*Buffalo, May* 26, 1852.

"L. J. Higby, Esq.—Dear Sir: I received protest to day on the Utica Insurance Company's acceptance, for loss per schooner Juniatta Patton. What the condition of the company is, I cannot say. I called at the office in Utica about a month ago, and the president and secretary told me, they thought there were assets enough to cover all their losses. Still they could not say definitely how they did stand. They pretended that their losses by fire at Milwaukee floored them. I paid the draft to-day, having been obliged to get it discounted shortly after I received it. I hope you will remit amount of above balance immediately, I suppose the company will not pay anything till all their outstanding policies mature or are canceled.

"Yours, &c.,        O. W. RANNEY."

To each and all of which letters the plaintiffs' counsel objected as inadmissible ; the objections were overruled and the evidence admitted by the court, and the plaintiffs' counsel excepted.

Lemuel W. Weeks was called as a witness by the defendant and testified substantially as follows :

An open policy is strictly one in which the risk is fixed, but

the value is not. What our merchants and business men generally call open policies, are only *quasi* open policies, in which the insured enters in his policy from time to time the description and value of the property he wishes to insure, and the description of the risk, and notifies the insurance company or its agent of such entry ; upon which the property is considered insured under that policy, subject to the conditions expressed in it. In these policies, property is often insured on account of one person, and the loss, if any, made payable to another. Then proof of loss only is required. Insurance companies pay losses only to the parties interested or their agents, or to the payees named in the policy. Insurance agents often settle the amount of loss by a draft on the company.

The defendant's counsel then rested.

The plaintiffs' counsel then offered in evidence the deposition of George W. Clark, taken the 8th day of July, 1854, in substance as follows :

In 1851, he was the agent of the Utica Insurance Company, and resided in Buffalo, where the plaintiff Ranney also resided and did business. The plaintiffs at that time insured through him salt, consigned to the defendant at Milwaukee. It was insured in that company, and shipped on the schooner Juniatta Patton and other vessels.

Three hundred and fifty barrels and two thousand bags were shipped on the Patton. It was insured at $1.12½ per bbl. and 12½s. per bag. The rate paid was two per cent. To the best of witness' recollection, the insurance was effected on the defendant's account, and the loss made payable to him in case of loss. The date of the insurance was about the 20th of November. Witness had not the policy nor a copy, nor does he know where it is, nor in whose possession. He supposes it to be lost. It was an open policy of insurance, in the usual form of an open marine policy, by which the company undertook to make good to Higby any loss that should happen to property insured on the voyage. No loss was ever paid on that policy to any one, to his knowledge. The company became insolvent, and stopped payment

in the spring of 1852, after he had ceased to be agent, and he believes it to be insolvent.

The defendant's counsel objected to so much of the deposition as states the contents of the policy, and the same was ruled out by the court, the remainder being admitted.

Whereupon the plaintiffs' counsel asked the court to instruct the jury:

1. That the contract was complete, when the salt was delivered, and that the defendant is liable for the purchase money and interest, unless he shows payment by himself or the insurance company.

2. That the plaintiffs' language in their letter of November 21st, cannot exonerate the defendant from the liability which had previously accrued.

3. That if the defendant's letter of 17th November, had not reached the plaintiffs at the time they shipped the salt, nothing contained in it, or in any subsequent letters from either party, affected Higby's liability as purchaser under the telegraphic order.

4. The letters of the plaintiffs do not show a contract by which Higby was exempted from liability to pay for the salt in case of loss.

Each of which instructions the judge refused, and the plaintiffs' counsel excepted.

Those parts of the judge's charge to which the plaintiffs' counsel chiefly objected, are as follows:

After stating the evidence on the former trial of this cause, and some of the additional evidence then before the jury, and after stating the contract claimed by the defendant's counsel, to be proved, the judge said to the jury: "It was competent for the plaintiffs to make such an agreement with the defendant, and if the evidence satisfies you that they did, they are bound by it; and if any of the salt was lost, as is proved, they are bound to get their pay from the insurance company, and could not come back on the defendant, although the company failed to pay."

Again: "It is the duty of the jury, to look to all the corre-

spondence of the parties, and all the proof in the case, to determine what the contract really was in all its parts; and if they find it in fact such as the defendant contends it was, as to the pay, then the plaintiffs were bound by it, and they cannot compel Higby to pay for any salt lost. This is a question wholly for your consideration, and you will apply the rule as you shall find the contract to be, in the manner directed by the court."

Again: "The jury are to determine what the bargain in fact was."

Again: "You will carefully examine all the evidence, and determine what the contract of the parties was, and in applying the rules given you by the court, you will determine whether the plaintiffs ought to recover."

And on request of the defendant's counsel the judge further instructed the jury as follows:

"The jury may gather the contract from all the letters offered in evidence, with the other proofs, and if it appears from them that the plaintiffs agreed to rely on the insurance in case of loss and look to the defendant only in case of arrival, then if the salt sued for in this case has been lost, the defendant is not liable, and the jury should find for him."

"That in case the draft (drawn by the agent on the insurance company) was taken payable to the plaintiffs, and insurance made in their names, it is a circumstance to be taken into consideration, with the other proof in the case, as tending to show that the plaintiffs insured on their own account."

"If the jury find in the letter of the plaintiffs of November 21st a promise on the part of the plaintiffs to look to the insurance company, and not to the defendant, in case of loss, such promise is not void for want of consideration."

"If the jury find a plain, clear and manifest contract made out by the letters, they cannot look at mere circumstances to infer a different contract; but all the proof is to be taken into view, to determine what the contract was."

To which instructions the plaintiffs' counsel excepted.

The jury found for the defendant, and judgment being entered on the verdict, the plaintiffs brought error.

*Winfield Smith,* for the plaintiffs in error.

*Brown & Ogden,* for the defendant in error.

*By the Court,* COLE, J.   The points insisted upon in this court by the counsel for the plaintiffs in error, are :—

1st. That the Circuit Court erred in submitting the question to the jury to determine what the contract was between the parties ; and

2d. That a proper, reasonable and sound construction of the contract shows that the plaintiffs are entitled to recover for the amount of the salt sued for, notwithstanding what is contained in the letter of November 21, 1851, and that the court should thus have instructed the jury.

We think it hardly admits of discussion, that the construction of this contract was a matter belonging exclusively to the court, and not to the jury. The court should have looked at the letters containing the contract, determined what it was, and the rights and liabilities of the parties under it. In the instructions asked for below by the counsel for the plaintiffs, and refused, the court was called upon to give a certain construction to the contract, which it declined doing, but charged the jury, in substance, that it was their duty to look at all the correspondence of the parties, and all the proof in the case, and determine what the contract really was in all its parts; that this was a question wholly for their consideration. In this, evidently, the court erred, and there must be a new trial, unless it appears that the plaintiffs were not injured by the charge, and that the jury gave the contract the correct construction, the same that the court must have given had it put a construction upon it, and were right in their finding. And this leads to the second point in the case, to wit: what was really the contract between the parties ?

When this case was before us, at a previous term, we stated that it appeared to be the ordinary case when a merchant in one place orders goods of another elsewhere; that the letters of Higby and the telegraphic dispatch, constituted an order for 1,500 barrels of salt; and that when the plaintiffs in pursuance

of the order, delivered the salt on board the Hale and Patton, the sale was consummated, and the liability of the parties became fixed. Conceding that this view of the case was correct, it is now contended, that by a subsequent arrangement, the relations of the parties became changed, the plaintiffs agreeing, in case the salt was lost on the way, to release Higby, and to look to the insurance company for their pay ; and that this appears from the letter of plaintiffs under date of November 21st, 1851. Although that letter is not entirely clear in its meaning, yet we do not think its language will fairly admit of such a construction. It is to be observed that the salt had been insured at Buffalo in the Utica Insurance Company, which was undoubtedly considered sound at the time of effecting the insurance. And from the previous letters between the parties, it appears that when salt was sold on time, the plaintiffs were accustomed to draw for the amount by bill payable at sixty days. This it seems was the usual course of dealing between the parties. Consequently, accompanying the plaintiffs' letter of November 21st, was a draft for $1,500, payable at sixty days, being the greater part of what was due them on account for salt already sent forward. Higby was requested to accept the draft; and as we suppose, return it to the plaintiffs in Buffalo, to be used by them as collateral security, at the bank, in getting paper discounted; and avoid the necessity of getting an indorser. The plaintiffs say they are obliged to realize on the salt, and so resort to this expedient. They remark in the letter, "should the salt now on the way to you be lost, we will look to the insurance company for the amount, and the paper may be returned." But when and to whom, returned? The acceptance of Higby being used at the bank as collateral security for plaintiffs' paper, would, in a great measure, be under their control. In the event the salt shipped by the Hale and Patton was lost, the amount of the insurance would cover the draft. And as we understand the letter, the plaintiffs in that case proposed collecting the money on the policy, and applying it to the credit of Higby, and for his benefit, either in taking up the acceptance, or in meeting it, if negotiated. Something of the kind was intended by the parties.

But we cannot believe anything more was proposed, or understood at the time. For it would be extraordinary, under the circumstances, for them to propose releasing Higby from all liability to meet his debt, and agree to look solely to the insurance company for their pay. We cannot imagine any possible motive for their so doing. They would not render the debt any more secure, or get their pay any earlier, but the contrary. Higby was in no wise prejudiced by the arrangement adopted. He did not become liable to pay one whit the sooner for the acceptance. He was accustomed to pay in sixty days. The plaintiffs gained nothing by Higby's acceptance, except it might have saved them the trouble of getting an indorser. But it was not as advantageous to them as it would have been to have had Higby's acceptance discounted in the usual course of trade, or not more so. So that in our view, construing this language as implying an agreement on the part of the vendors to absolutely release their debt against Higby, and look to the insurance company for their pay, is giving to the language a most unreasonable and forced construction.

It is insisted by the counsel for the defendant in error, that the plaintiffs had been paid, by a draft upon the insurance company. But how can that proposition be maintained in view of the proof in the case? In their letter of May 26th, 1852, introduced by the defendant, the plaintiffs say that the company had failed, and that they took up the draft after having discounted it. This shows very clearly that they had realized nothing upon this draft, and warrants the presumption that it was in their possession when the suit was brought. Yet the draft belonged to the defendant, and should have been produced at the trial. The defendant is entitled to the money upon it from the insurance company. We do not find that upon the trial any particular objection was made by the defendant because the draft was not produced, and, therefore, we do not think it would be right to charge the plaintiffs with it, at this stage of the cause, merely on the ground of this omission.

The judgment of the Circuit Court must be reversed and a new trial ordered.